# EXHIBIT A

In the Matter Of:

# A.M.

vs.

# VALVE CORPORATION

## ANTONELLA MADDALENA

May 06, 2017



Moburg, Seaton & Watkins
2033 Sixth Avenue, Suite 826
Seattle, WA 98121
(206) 622-3110
www.moburgreporting.com

Court Reporters & Legal Video

```
 1                 UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
 2     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       A.M.                          )
 3                                   )
                        Plaintiff,   )
 4                                   )
          vs.                        )    No. 2:16-cv-01166-TSZ
 5                                   )
       VALVE CORPORATION,            )
 6                                   )        COPY
                        Defendant.   )
 7     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 8

         Videotaped Deposition Upon Oral Examination
 9
                                of
10
                      ANTONELLA MADDALENA
11

12     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13

14                        8:56 A.M.

15                       May 6, 2017

16             1001 Fourth Avenue, Suite 4500

17                    Seattle, Washington

18

19

20

21

22

23

24
       Valerie L. Seaton, RPR, CCR
25     License #2557
```

```
 1                THE VIDEOGRAPHER:  We are on the record.

 2  This is the videotaped portion of the deposition of

 3  Antonella Maddalena.  This deposition is being recorded

 4  this 6th day of May 2017.  The time is now 8:57 A.M.

 5                Will the court reporter please swear in the

 6  witness so we can proceed.

 7  ANTONELLA MADDALENA, witness herein, having been

 8                          duly sworn by the Certified

 9                          Court Reporter, testified under

10                          oath as follows:

11                          EXAMINATION

12  BY MR. SHAPERO:

13       Q.    Okay.  Ms. Maddalena, I'm Larry Shapero.  And

14  I --

15       A.    Nice to meet you.

16       Q.    -- I think you know I'm an attorney that

17  represents Valve.  And we're here to take your deposition

18  today.

19             Do you understand all of that?

20       A.    Yes.

21       Q.    And have you been deposed before?

22       A.    Never.

23       Q.    All right.  So let's just go over some ground

24  rules.

25             The court reporter's sworn you in.  And you
```



16    Q.  Well, let's start with asking permission.  For
17 any of these surgeries, did you ask Valve for permission to
18 take time off from work in connection with any of these
19 surgeries?
20    A.  Usually, the way the communication went is this:
21 I would contact Dina or my supervisors, and I would say, "I
22 need a surgery coming up.  Is it okay if I do this, this,
23 this and that?  Please don't hesitate to give me
24 suggestions if you want me to do it differently."
25        So to answer your question, it's not really a

Page 45

1 formal asking of a permission.  It's more of an interactive
2 dialogue where I present the situation very kindly, very
3 politely, despite what they might have told you.  I've
4 always tried to be extremely polite and extremely kind, I
5 would say.
6        And that's how I asked permission, if that's what
7 you mean by asking permission.
8    Q.  And --
9    A.  Yeah, go ahead.  Sorry.
10    Q.  What was the response?  In every case, did Valve
11 just say, "Sure, go do those."
12    A.  The response from Dina was always, "How many
13 surgeries do you have left?"  Always.
14    Q.  All right.  And what else?
15    A.  They would tell me that -- we would agree.  We
16 would agree on the days I would take off and how much time
17 I need.
18    Q.  Okay.  You said you contacted supervisors.
19    A.  Yes.
20    Q.  Who were the supervisors at Valve you're talking
21 about?
22    A.  Yeah.  So I've had several formal supervisors.
23 There was even the main supervisors in the time sheets.
24        My first supervisor was Doug Valente and Patrick
25 McClard.  They were both supervisors.

1    Q.  What completely different thing would you prefer
2  to do?
3    A.  There are many things that I would like to.  I
4  would -- I would love to be a forensic anthropologist, for
5  instance, because I've studied that a lot.  I've studied it
6  by myself.
7        I don't have formal training in forensic
8  anthropology, but because of my previous studies I have the
9  methodology, the analytical tools, the cognitive tools to
10  be able to study and to absorb knowledge in certain fields.
11    Q.  Have you asked Netmarble if you can work from
12  home some or all of the time?
13    A.  I have not asked directly, but I have tried to be
14  very thoughtful and diplomatic in the sense that -- let me
15  explain one second.  I was just hired, so I am not going to
16  go there and ask them to work from home.
17        But as a hypothetical situation, I said, "Would
18  you be open -- what about -- do people work from home?"
19  And right now, they said no.  So right now, I will have to
20  reevaluate that problem after my probation period.  Because
21  it's really killing me.
22    Q.  How many people work in the office at Netmarble
23  in Buena Park?
24    A.  Forty.
25    Q.  Forty.  How many of those are translators?

1    A.  This is an estimate.  I would say probably ten.
2    Q.  Do you work in an office with a closed door or in
3  a cubical or in an open area?  Describe that for me.
4    A.  Like I said before, I said it's an open space.
5  So no cubicles.  It's a big room with bright lights with
6  people, a lot of people.  I mean a lot of people for me.
7  Forty people in the same room.
8    Q.  Okay.  Have you applied for disability benefits?
9    A.  I have.  I have.
10    Q.  Okay.  When did you apply for disability
11  benefits?
12    A.  Last year.
13    Q.  Do you remember the month that you applied?
14    A.  Probably, it was April.  The first application,
15  right, you mean?
16    Q.  Okay.  First -- how many times did you apply?
17    A.  No.  I mean -- I mean the first application that
18  I sent over, we sent over.  Or the different steps.
19    Q.  Okay.  So in approximately April of 2016, you
20  think you applied for disability benefits?
21    A.  Yes.
22    Q.  That was when you formally submitted an
23  application, you think?
24    A.  I think so, but now you're making me doubt
25  because you lose the cognition -- how do you say?  You lose

1  the track of time when you are under so many things and so
2  much trauma, you lose --
3    Q.  I lose track of time myself pretty routinely.
4    A.  I would say I would think that it happened in
5  April.  But if it happened in May, then please don't hold
6  it against me, because I don't --
7    Q.  Understood.  Understood.
8        To whom did you apply for disability benefits?
9  To which agency or insurance company?
10    A.  No.  It's a disability state, the state of
11  California.
12    Q.  State of California?
13    A.  Yes.
14    Q.  Did you receive any disability benefits from the
15  state of California?
16    A.  No.  No.
17    Q.  And why is that?  Do you know?
18    A.  This is what I've been told.  I will explain.
19  Usually, because there are a lot of people applying for
20  disabilities, their default answer is to deny the benefits.
21  And then once they deny the benefits, you have to appeal.
22        And you have to go through a process, which might
23  be very lengthy because, of course, I understand they want
24  to discourage it.
25        However, in my case, I could not afford waiting

1  two years for an appeal, because I needed to have some
2  source of income to survive.
3    Q.  Okay.  When your work at Valve ended -- your work
4  at Valve ended in January 2016; is that correct?
5    A   What do you mean?
6    Q.  Isn't that when Valve terminated your work
7  arrangement, your independent contractor agreement that you
8  had with them?
9    A.  They --
10        MS. RHOADS-WEAVER:  Object to form
11    Q.  (BY MR. SHAPERO)  Is that correct?  Is that when
12  they terminated your work relationship?
13    A.  I mean, to be honest with you, I don't understand
14  this question because they fired me on January 15, 2016.
15  And so everybody knows the exact date, so I don't
16  understand why you're asking me that.  I'm sorry.  I'm
17  confused.
18    Q.  I'm just asking you to answer it.  You have
19  answered it.  So thank you.
20        And so you're saying that if -- you then applied
21  for disability benefits a few months later, in April 2016;
22  is that right?
23    A.  Yes.
24    Q.  All right.  Did you look for work during the time
25  between the time that you lost your -- again, I'll use your



1 Beverly Hills. So when you sue, basically, you go to court
2 that is closest to the person you're suing, to the
3 defendant.
4    Q.   And what was the basis for your action, that you
5 did not have a security deposit returned to you?
6    A.   I did not have a security deposit returned to me,
7 and then I sued in small claims. And I won.
8    Q.   Okay. And have you sued anyone else?
9    A.   No.
10    Q.   Do you recall telling people at Valve that you
11 sued every landlord you'd ever had?
12    A.   No, I don't recall that.
13    Q.   Okay. Did you tell people at Valve that you were
14 maintaining a file of some kind on either them or Valve in
15 case you ever lost your job at Valve?
16    A.   I might have said people that I am a diligent
17 record-keeper. I do not say that I have -- I was actually
18 maintaining a file. So I didn't use that expression.
19    Q.   All right. Did you maintain a file of some kind
20 on your interactions with people at Valve?
21    A.   I did maintain a file specifically. I have --
22 most of the documents are retrievable in my inbox. I did
23 not have a, physically, a separate file entitled "Valve in
24 case I get fired." No, that never happened. Whoever said
25 that, it's a lie.

1       But I did -- I've always tried to keep records of
2 everything and to be on top of everything, not only at
3 Valve, but everything.
4    Q.   Why is that? Why do you keep detailed records of
5 everything?
6    A.   I like to be organized, but I also like to take
7 precautions.
8    Q.   Why do you like to take precaution?
9    A.   Well, because I knew that Valve -- I could
10 literally -- I knew that Valve was plotting something
11 against me, so I had to protect myself.
12    Q.   When did you decide Valve was trying to plot
13 something against you?
14    A.   As soon as they realized -- as soon as they
15 realized -- they came to the realization that there was
16 going to be a transition.
17    Q.   And what caused you to believe that Valve was
18 plotting with you as soon as they realized there was going
19 to be a transition -- well, actually, let's just back up.
20 Strike that.
21       You say that you thought Valve was plotting
22 against you as soon as they realized there was going to be
23 a transition.
24       What transition are we talking about?
25    A.   The gender transition.

1    Q.   When did you first tell Valve that there was
2 going to be a gender transition?
3    A.   So around -- as soon as I was hired, around
4 2009 -- first of all, I have to premise that Valve has
5 probably 300 employees or even more.
6       So I am positive -- I'm pretty sure that out of
7 these 300 people, there are people who are wonderful and
8 there are people who are very good. However, the
9 supervisors, the people who have decisional power, those
10 are the ones that wanted to get rid of me and were
11 uncomfortable with me.
12       So in 2009, there were a lot of people talking
13 and ridiculing me and making fun of me and using derogatory
14 expressions. And so I had a conversation with Dina Nelson
15 and Kathy Gehrig, the former HR person. And I was -- this
16 was in 2009 after Brock Loomis and Keith Huggins and Romy
17 Hatfield and Justin Lesamiz, all those people were making
18 fun of me, that they thought that I was a freak to be made
19 fun of.
20       So in that moment, I was scared to death that I
21 was going to lose my job, because in my experience, every
22 single transsexual I have met in my life, they are always,
23 always, always fired after the completion of the
24 transition.
25       The company shows a fake acceptance. They look

1 liberal. They pretend to support you, but then they always
2 find ways to manage you out. So once people, employees,
3 they were discussing about my transition, the fact that I
4 was different, I was terrified that I was going to lose my
5 job.
6       So I had a conversation with Dina Nelson and
7 Kathy Gehrig in 2009. And I remember there were tears in
8 that conversation. There were tears even from Kathy
9 Gehrig, because she was touched. And I told them. I was
10 very honest. I said, "Listen. These people -- there are a
11 lot of people that are making fun of me, and they're using
12 derogatory terms. And they're literally harassing me."
13       I said, "But if you're worried that I'm going to
14 show up here dressed like a drag queen, that's not going to
15 happen. Because I try -- I want to try to keep a low
16 profile and be as invisible as possible."
17       And they gave me a corporate response. This was
18 in 2009. And in 2009, I was still on the verge of whether
19 I had to transition or not, because I was really scared.
20    Q.   You said that every transperson that you know has
21 gotten fired after completing the transition.
22       Do you recall that testimony?
23    A.   Yes, I do.
24    Q.   Can you name every one of those people for me?
25    A.   Beth Spring is one. Nichole, I don't know her



1 last name, is another one. I've met people in the
2 community, whose names I don't even remember. And they
3 always come up to me and say -- oh, Laura Gonzalez was
4 another one. She was fired after completing the
5 transition.
6      The companies usually take a little bit of time
7 so that they don't make it so obvious. They make it look
8 like they accept you, but then you're out. You're not
9 human anymore.
10   **Q.** Anybody else?
11   A. I'm sure that if I had time, I could complete
12 your list with many, many, many names. Right now I can
13 only think of these three people.
14   **Q. Okay. You said that at Valve, starting in 2009,**
15 **people starting making fun of you?**
16   A. Yes.
17   **Q. Okay. Who made fun of you?**
18   A. Brock Loomis.
19   **Q. Okay. Hang on. I want to write this down.**
20      Brock Loomis.
21   A. Yes.
22   **Q. Who else?**
23   A. Justin Lesamiz.
24   **Q. Who else?**
25   A. And then there was another guy, whose name I

Page 11
1 don't remember now, that he switched to IT. Eric Weils,
2 Eric Wells, something like that.
3   **Q. Who else?**
4   A. Did I mention Keith Huggins?
5   **Q. Anyone else?**
6   A. Well, Torsten started making -- saying derogatory
7 things but not in -- as far as I know, not in 2009. So I'm
8 giving you the names of people in 2009.
9   **Q. Anyone else?**
10   A. Let me think one second. I do remember
11 that there was one guy. His name was Nate Heller, and he
12 brought his wife over one day. And while I was walking by,
13 I clearly saw him nudging, like elbowing, he was doing
14 this.
15   **Q. That's fine, yeah. Okay.**
16   A. Referring to me.
17   **Q. And what you're describing is someone who gently**
18 **elbowed his companion and pointed at you?**
19   A. Yes. Then there was also Romy Hatfield, who as
20 soon as she was hired, she was asking questions about
21 whether I was a man or a woman, if I was gay, if I was
22 this. They were all inappropriate questions.
23      Oh, how could I have forgotten? Patrick McClard.
24 The supervisor, Patrick McClard.
25   **Q. What's his last name, McClard?**

Page 112
1   A. M-C-C-L-A-R-D.
2   **Q. Okay. Anyone else?**
3   A. I can't remember now the other names.
4   **Q. All right. Why don't you describe for me every**
5 **derogatory comment Nate Heller ever made about you?**
6   A. Nate Heller. Nate Heller didn't specifically
7 make derogatory comments about me in my face, but when his
8 wife -- his wife of that time came to the office, he was
9 nudging at his wife and pointing me out with a smirk on his
10 face.
11   **Q. And do you know what he said? Did you hear what**
12 **he said?**
13   A. I am a person who is -- always lived this life
14 for a few years. Once you've lived this life for a few
15 years, you develop one skill. And that skill is that
16 you're able to read people's body language. Like if
17 somebody is laughing at you and pointing at you, it's
18 pretty obvious. They don't need to tell you anything at
19 your face.



9   **Q. Well, I'm going to go back to my question about**
10 **Nate Heller.**
11      So can you please state every occasion on which
12 **you actually heard with your ears Nate Heller say something**
13 **critical to you or something insulting in any way?**
14      MS. RHOADS-WEAVER: Objection. Asked and
15 answered and argumentative.
16   **Q. (BY MR. SHAPERO) Can you please answer the**
17 **question?**
18   A. I already answered the question, what I heard
19 about -- what I saw about Nate Heller.
20   **Q. No. The only thing you said about Nate Heller is**
21 **something you saw with him placing his elbow into his wife**
22 **and pointing at you. I'm asking you a different question.**
23      I want to know every occasion on which you
24 **actually heard words used by Mr. Heller that were critical**
25 **of you or insulting of you or that were mocking of you.**



1    A.   When did I say that I heard him?

2    Q.   That's what I'm asking.  Was there ever such an

3 occasion?

4    A.   I didn't hear him, no.

5    Q.   All right.  During the entire time that you

6 worked with Nate Heller, you never heard him?

7    A.   Heard with my ears, no.  I just saw things, but I

8 never heard him.

9    Q.   Okay.  And when you say you saw things, the only

10 thing you saw was one occasion on which you say his then

11 wife was in the office; is that correct?

12   A.   Yes.

13   Q.   That was the only occasion?

14   A.   Yes.

15   Q.   And this was in approximately 2009?

16   A.   Yes.

17   Q.   Okay.  The next person you named is Brock Loomis?

18   A.   Yes.

19   Q.   Can you please describe every occasion on which

20 you heard Brock Loomis say something about you that was

21 derogatory or insulting or mocking or that you felt was

22 inappropriate?

23       A.   There were a few times, like especially during

24 meetings, that I would hear him saying "a tranny" or "a

25 fag," things like that.  And, of course, I had to keep my

1 composure because I could not confront him at work.  But I

2 definitely heard him smirking and saying, "It doesn't look

3 like a woman.  Doesn't look like a man.  What is it?"

4    Q.   How many times did Brock Loomis refer to you as a

5 "tranny"?  How many times did you hear him use that word?

6    A.   I've heard him at least three times.

7    Q.   All right.  And was this all in 2009?

8    A.   I don't remember the dates exactly in that case.

9    Q.   All right.  How many times did Brock Loomis ask

10 you if you were a man or a woman?

11       A.   Where do you get that he asked me?  He was asking

12 himself.  You know, he was talking to other people.  He

13 said, "Is that a man?  Is that a woman?"  And that would

14   Q.   How many times did you hear that kind of a

15 conversation?

16   A.   Okay.  One time I heard, "Is that a man?  Is that

17 a woman?"  And then smirking, and he was talking to Fred.

18 Fred, a guy who was working back then.  It was an Asian

19 guy.  His last name is Duong.  Fred -- starts with a D.

20 His last name starts with a D.

21       But Fred was not active -- Brock Loomis was

22 talking to Fred.

23   Q.   Okay.

24   A.   But Fred was not endorsing his behavior.

25   Q.   I understand.

1    A.   I want to be very clear about that.  So it was

2 Brock Loomis that was doing that.  So that was one time.

3       And then the other time that he used the word

4 "tranny."

5       Now what was the other question?

6    Q.   Anything he said that you heard him say was

7 inappropriate.

8    A.   Yeah.  Tranny.  Tranny.  Tranny.

9    Q.   Okay.  And is there anything else that you

10 believe that Brock Loomis did that was inappropriate with

11 respect to you?

12   A.   I was -- I was then told by other people.

13   Q.   Who told you?

14   A.   Fred.

15   Q.   Anybody else?

16   A.   Liz.  Liz Cambridge.

17   Q.   Liz Cambridge?

18   A.   Yes.  We talked.

19   Q.   What did Liz Cambridge tell you?

20   A.   That Brock Loomis was making fun of me.

21   Q.   All right.  Did you work closely with Brock

22 Loomis?

23   A.   We worked in the same building, in the same area.

24   Q.   Do you know what he did for a living?

25   A.   He was working for support.

1    Q.   Do you know -- does he still work at Valve?

2    A.   He was fired.

3    Q.   When was he fired?

4    A.   I don't remember when, but I remember why.

5    Q.   Why?

6    A.   Because he was making jokes about Jews.

7    Q.   I see.

8    A.   Yes.

9    Q.   How do you know he was fired because he was

10 making jokes about Jews?

11   A.   Because Doug Valente told me.

12   Q.   All right.  And did that happen -- was he fired

13 while you were still working and living in Seattle?

14   A.   Yes.

15   Q.   Do you know if Nate Heller still works for Valve?

16   A.   He was fired.

17   Q.   When was he fired?

18   A.   I don't remember when.  But I remember I was in

19 Los Angeles when he was fired, yes.

20   Q.   All right.  Then the next name you mentioned was

21 Justin?

22   A.   Lesamiz.

23   Q.   Lesamiz.

24       What did you hear Justin Lesamiz say about you

25 that you believe was inappropriate?



1    A.  Sorry.

2    Q.  It's all right.

3    A.  This is very traumatic for me to recall all these
4 events.  One day I was walking to the bathroom, and he was
5 walking in the opposite direction.  And he was with another
6 guy.  I don't know where this guy worked.  Maybe in another
7 department.  And he said -- he looked at me and he said
8 "tranny," and he laughed.

9    Q.  When did that happen?

10   A.  I think it happened -- this was in the new
11 office, not in the old one.  It was the new office.  So
12 whenever we moved back to the new office.

13   Q.  How many times did you hear Justin say something
14 like this to you?

15   A.  Heard with my own ears --

16   Q.  Yds.

17   A.  -- the word "tranny" happened once.

18   Q.  All right.

19   A.  But I want to say something.

20   Q.  Yeah.

21   A.  Justin also worked in IT.  And for no reason, he
22 was incredibly rude to me.  Really, really had the
23 prejudice against me.  I mean, that -- what I'm trying to
24 say is you have to put things into a context.

25       Because if you analyze every single element

1 separately, you might dismiss me, and you might say, okay,
2 well, he called you tranny only once.  It's not a big deal.
3 It is a big deal because it's a very derogatory term.

4    Q.  But --

5    A.  One second.  Let me finish.  I'm sorry.

6       It's a derogatory term.  It was unwarranted.  I
7 didn't do anything to him to provoke it.  That term, that
8 incident, coupled with all the times that I [sic] had to
9 interact with me and he was extremely rude, objectively
10 rude.

11      I remember one time, even in May, a conversation
12 he apologized for being rude, because I had to ask him why
13 he was being so rude.

14   Q.  And what did he say?

15   A.  "Sorry if I sounded rude."

16   Q.  Was he rude to other people?

17   A.  No.

18   Q.  How do you know?

19   A.  I saw him interacting with other people.

20   Q.  I see.  Did you ever ask anybody if Justin was
21 rude to them?

22   A.  I asked them, yes.

23   Q.  And what did they say?

24   A.  They said, "No.  He's fine."

25   Q.  Who said that?

1    A.  I remember Romy said that.  Caroline said that.

2 What's her name?  Liz said that, that Justin was just fine.

3    Q.  Do you know if Justin still works at Valve?

4    A.  As far as I know, he's still working at Valve,
5 yes.

6    Q.  All right.  Eric Wells.  Who's Eric Wells?

7    A.  Eric Wells was a guy who started working in the
8 billing department, and then he moved to IT.

9    Q.  And what exactly -- well, how many times did Eric
10 Wells say something that you heard that you felt was
11 offensive or demeaning or insulting, inappropriate?

12   A.  What I wanted to explain is that somebody who's
13 calling you a derogatory name once, you hear them once, I
14 don't think they need to do it like a thousand times to be
15 construed as inappropriate behavior.

16   Q.  Well, I'm just asking you questions, okay.  You
17 get to make your arguments to the court later on, perhaps.
18 But right now, the only thing we're here to do is for me to
19 ask you questions, and for you to truthfully answer my
20 questions.

21      Remember, I explained that at the beginning?

22   A.  Yes.

23   Q.  Do you remember that?

24   A.  Yes.

25   Q.  Okay.  So can you just please answer my

1 questions?

2    A.  Can you please repeat the question?

3    Q.  Happy to repeat the question.

4       Can you please name every occasion --

5    A.  No, no, no, no.

6    Q.  -- on which you heard Eric Wells say something to
7 you that you considered to be demeaning or insulting or
8 inappropriate?

9    A.  I remember one time, he came with a dog.  He had
10 a very big dog, like a Rottweiler, and he came with another
11 friend.  And this was at the old office.  And the other
12 friend, they were staring at me, like looking -- they were
13 trying to figure me out.  And what's his name, Eric, said,
14 "She-man."  He used this term "she-man."

15   Q.  How many times did --

16   A.  Just once.

17   Q.  Is that the only occasion in which you heard Eric
18 Wells say something that you felt was inappropriate,
19 insulting, demeaning?

20   A.  Yes.  Yes.

21   Q.  Okay.  Do you recall when that was?  You said it
22 was in the old office.

23   A.  I remember that he had his dog with him.
24 Probably was in the -- yes, it was in the old office.

25   Q.  Okay.  Just so I can understand, was it routine



1 for Valve employees to bring their dogs to work back then?

2     A.  A few people brought their dogs.  Like Brock

3 brought his dog, too.

4     **Q.  Okay.**

5     A.  Yeah, a few people brought their dogs.

6     **Q.  So was this back in 2009?**

7     A.  Which one?

8     **Q.  Whenever it was that Eric Wells, you said, made**

9 **this comment.**

10     A.  Like I said, some events can be placed very

11 specifically.  For some events, I remember the dates very

12 well.  For others, the dates are sort of blurry.  I

13 remember other element -- other contingencies, and then I

14 can make sense.  I can say, okay, it was in the old office,

15 so that means 2009.  If it's in the new office, it's 2010.

16 But I cannot give you an accurate date.

17     **Q.  All right.  So you said you clearly recall**

18 **Mr. Wells' comment was made in the old office; so thereby,**

19 **I think you're saying it would be 2009.**

20     A.  Unless we moved in another year.  If somebody can

21 help me to remember which year we moved to the new office.

22     **Q.  I understand.  Okay.**

23     **The next one was, I think you said, was Keith**

24 **Huggins?**

25     A.  Yes.

1     **Q.  Tell me every occasion in which Keith Huggins**

2 **said something that you personally heard that you**

3 **considered to be insulting, demeaning and inappropriate?**

4     A.  So Keith Huggins would ask me translations into

5 Italian as a favor, and I was happy to do him this favor.

6 Until a certain point. Romy told me that Keith Huggins was

7 saying that I was a tranny and that at the previous job,

8 somebody transitioned and was a tranny, and they changed

9 their name into Rachel.

10     And so by this, Keith Huggins told Romy that I

11 was -- I was a tranny as well.  And so Romy told me. Once

12 Romy told me, and Keith Huggins sent me an email to request

13 a translator -- a translation, and this was 2009, I told

14 Keith, "I've been nothing but nice to you.  Why are you

15 saying that I'm a tranny?  Why are you talking about me?"

16     And he said, "Can you come upstairs so we can

17 clarify?"

18     So I went upstairs, and I burst into tears.  And

19 he apologized.  He said that he's sorry.  He felt it was

20 inappropriate, but he was just being silly, I guess.

21     **Q.  Okay.  So is that the only occasion in which you**

22 **ever heard Mr. Huggins say anything about your trans**

23 **status, in that conversation where he apologized?**

24     A.  I have to be very specific here.  It's the only

25 time, but I didn't hear it myself.  Romy told me, and then

1 Keith Huggins admitted.  And he apologized.

2     **Q.  Right.**

3     A.  But I told Keith Huggins -- I said, "Do you

4 realize what you're doing, that you're saying I am a

5 tranny?  Not only is that derogatory, but you're saying

6 something in a company context.  Are you not afraid that

7 these people are going to fire me because of that?"

8     And he apologized. He said, "I'm sorry.  I'm

9 sorry.  I was not thinking right."  And he apologized.

10     **Q.  And did it ever happen again?**

11     A.  As far as I know, no.

12     **Q.  And do you recall roughly when that was?  Was**

13 **that in the old office or the new office?**

14     A.  I told at the beginning, it was 2009.  You're

15 asking again?

16     **Q.  What about --**

17     A.  Patrick McClard.

18     **Q.  Okay.  Patrick McClard.  Tell me every occasion**

19 **in which you actually personally heard Patrick McClard say**

20 **something to you that you thought was insulting, demeaning**

21 **and inappropriate.**

22     A.  When I was hired in 2008, they had a party.

23 Valve had a party at the place, and I was there with -- I

24 have a very dear friend.  His name is Sergio.  He's just a

25 friend.  He's always been a friend, nothing more than a

1 friend.  And so Sergio came with me to Seattle, and he came

2 to this party.

3     And when Patrick McClard looked at me and looked

4 at him -- and, again, we've never been a couple with

5 Sergio, never.  He said to his girlfriend -- I clearly

6 heard it.  He said "fags."  He used the term "fags."

7     **Q.  All right.  And do you remember when that**

8 **happened?  Was that 2009?**

9     A.  Like I said at the beginning, it was in 2008.

10     **Q.  Okay.**

11     A.  It was the party.

12     **Q.  So it was right after you started?**

13     A.  Right after I started.

14     **Q.  Okay.  And is that the only occasion in which you**

15 **ever heard Mr. McClard say something inappropriate,**

16 **insulting, demeaning like that?**

17     A.  Yes.

18     **Q.  Okay.  Do you know if Mr. McClard still works at**

19 **Valve?**

20     A.  No, he's not working.

21     **Q.  Do you know when he left Valve?**

22     A.  No.

23     **Q.  How do you know he's not working?**

24     A.  Because I remember hearing that he was fired, but

25 I don't remember exactly when.



1    Q.   Okay.  You said -- I think you said Romy Hatfield
2  said things about you that were inappropriate and
3  insulting?
4    A.   Yes.
5    Q.   What was every occasion that Romy Hatfield said
6  something that you actually heard that was insulting or
7  demeaning or inappropriate?
8    A.   So in 2008 and in 2009, but especially in 2008,
9  as soon as she was hired, she was asking Caroline -- and we
10  had a conversation with Doug Valente, too.  And Caroline
11  was there.  She was asking Caroline if I was gay and if I
12  was top or bottom.
13      Why would you ask those questions?
14    Q.   Again, I just want to make sure I
15  understand this.
16      Did you hear Romy Hatfield say these things that
17  you just described?
18    A.   No, I didn't hear her.
19    Q.   So, again, just listen to my question carefully.
20      Name every occasion where you personally heard
21  Romy Hatfield say something about you that was offensive,
22  insulting or demeaning.
23    A.   I did not hear her with my own eyes -- with my
24  own ears.  But, again, I talked to her after work, and she
25  admitted that she -- yeah.

1    Q.   Okay.  So there was one occasion, I gather, in
2  which you had a conversation with Romy Hatfield about
3  comments you heard that she had made to others; is that
4  correct?
5    A.   Comments that others told me that she had made.
6    Q.   So tell me about that one conversation you had
7  with Romy Hatfield about this subject.  What happened?
8    A.   I said -- I told her, "Listen, Romy, do you
9  really think it's appropriate to say those things?  You've
10  just been hired.  Why would you say those things about me?
11  I never did anything wrong."
12      I remember I made the comment when we had the
13  conversation with Doug Valente, because at the beginning,
14  Romy -- they were thinking about firing Romy at the
15  beginning.
16      So we had a conversation.  It was Caroline
17  Müller, Antoine Bourdon, myself, Doug Valente.  On that
18  occasion, Caroline said to Doug as well that Romy was
19  saying inappropriate things about me.
20    Q.   All right.  But I was just asking you about the
21  conversation you had with Romy.
22    A.   Yes.
23    Q.   Okay.  You remember that was my question.  Tell
24  me about your conversation with Romy.  And I think what you
25  said is you asked her why she was making these comments

1  that you felt were inappropriate.
2    Q.   Did I accurately characterize your testimony on
3  that subject?
4    A.   Yes.
5    Q.   Okay.  Now let me what Romy Hatfield said to you
6  in response when you asked her those questions.
7    A.   She said that she has no problems with me and
8  that people are different.  She was just curious.
9    Q.   Okay.  Did she apologize?
10    A.   Yes.
11    Q.   Did you ever have any incident happen like this
12  again with Romy?
13    A.   No.  Because I was --
14    Q.   It's just yes or no.
15    A.   No, it's not.  Sorry it's not a yes or no answer.
16  I didn't have any specific incident like this, but it's
17  also because I was polite, but I kept my distance.  Because
18  once an employee asks if somebody's top or bottom to
19  another employee, how can I trust that person again?
20      So I didn't want to dig, but I'm pretty sure that
21  if I digged [sic] more, I would find out more things.
22    Q.   Yes.  But I'm just asking about the actual
23  experiences you had with Romy Hatfield.
24      Do you understand the question I'm asking?
25    A.   Okay.

1    Q.   All right.  So, again, just to sum up, you
2  heard Caroline Müller tell you that Romy Hatfield had made
3  some offensive comments.  That was something that was
4  reported to you on one occasion.  Then you spoke with Romy
5  Hatfield.  Then Romy Hatfield apologized, and you never
6  heard anything like that again; is that correct?
7    A.   Yes.
8      MR. SHAPERO:  All right.  Why don't we take
9  a lunch break.
10      THE VIDEOGRAPHER:  There is the end of Disk
11  No. 2.  This deposition will continue on Disk No 3.  The
12  time is now 12:16 P.M.  Going off the record.
13      (Off the record from
14      12:16 to 12:51 P.M.)
15      THE VIDEOGRAPHER:  We're back on the record.
16  This is the beginning of Disk No. 3 in the continuing
17  deposition of Antonella Maddalena.  The time is now 12:51
18  P.M.
19    Q.   (BY MR. SHAPERO)  All right.  Ms. Maddalena,
20  we're back on the record after a lunch break of about 40
21  minutes.  Do you believe you have given truthful and
22  accurate testimony so far today?
23    A.   Yes.
24    Q.   And do you believe you are still able to give
25  truthful and accurate testimony?



Page 130

1    A.   Yes.

2    Q.   All right.  Just before the break, we were going

3  through a list of people that you indicated, I think, that

4  had mistreated you in some way starting in 2009.  Do you

5  remember that?

6    A.   Starting in 2008.

7    Q.   Okay.  Starting in 2008.  And we talked about

8  Nate Heller, Brock Loomis, Justin Lesamiz, Eric Wells,

9  Keith Huggins, Romy Hatfield and Patrick McClard.  And I

10  think you indicated that that, so far as you could

11  remember, the only people at Valve who, in some ways,

12  believe treated you inappropriately in 2008 or 2009.  Did I

13  understand that correctly?

14        MS. RHOADS-WEAVER:  Object to form.

15    A.   From 2008 onward.

16    Q.   (BY MR. SHAPERO)  Okay.  All right.

17        So this list actually is describing everybody you

18  think mistreated you in some ways because of your

19  transition -- gender transition status throughout your

20  tenure at Valve.  Is that what this list is?

21    A.   Throughout my seven years at Valve, these are

22  people who mistreated me because of their perceive --

23  because of what they perceive me, what my orientation was

24  and what my gender identity was.

25    Q.   Okay.  Is there anybody else -- you actually

Page 131

1  listed Torsten Zabka.  You said he didn't start making

2  inappropriate comments until later, so we haven't talked

3  about him yet.

4        Is there anybody else that should be on this list

5  that you've omitted?

6    A.   There might be somebody else, but I don't

7  remember now.

8    Q.   All right.  So we've talked about everybody on

9  this list except for Torsten Zabka.

10        So can you please tell me every occasion in which

11  you heard Torsten Zabka make comments to you that you

12  thought were insulting, demeaning, otherwise inappropriate

13  based on your gender identity?

14    A.   I didn't hear.  I read.

15    Q.   Okay.  What did you read from Torsten that

16  Torsten was -- let's just break this down first.

17        Was there ever an occasion in which Torsten Zabka

18  sent you an email in which he made what you believe were

19  demeaning or insulting, derogatory comments based on your

20  gender identity?

21    A.   Never.

22    Q.   Never.  Okay.  So was there ever an occasion on

23  which someone sent you an email in which Torsten Zabka said

24  or -- strike that.

25        Was there ever an occasion on which anybody told

Page 132

1  you that Torsten Zabka made comments about you that were

2  demeaning or insulting based on your gender identity?

3    A.   Yes.

4    Q.   Who told you that Torsten Zabka made such

5  comments?

6    A.   Juan José Villegas and Juan Lo.

7    Q.   All right.  And who is Juan Lo?

8    A.   Juan Lo is another unpaid translator.

9    Q.   And who is Juan José Villegas?

10    A.   He's an unpaid translator.

11    Q.   Okay.  How many times did Juan José Villegas tell

12  you that Torsten Zabka said something insulting or

13  demeaning to you based on your gender identity?

14    A.   Twice.

15    Q.   Do you remember, when was the first time that

16  Juan José Villegas told you this?

17    A.   Yes.  The first time was when Juan José was

18  correcting Torsten via email, and Torsten initially refused

19  to use my female name or my -- refused to refer to me as

20  "she."

21    Q.   Do you remember when Mr. Villegas told you this?

22  When did he deliver this message to you?

23    A.   This is the first time, correct?

24    Q.   Yeah.  What's the first time Juan José ever said

25  to you, Hey, I want you to know about this thing that

Page 133

1  Torsten said?

2    A.   2011.

3    Q.   Okay.  And when -- was there any other occasion

4  in which he said -- Mr. Villegas told you something like

5  this?

6    A.   There was another occasion.

7    Q.   When was that?

8    A.   This was after my termination.

9    Q.   Okay.  And what you mean is after January of

10  2016?

11    A.   Correct.

12    Q.   Okay.

13    A.   If I remember correctly.

14    Q.   All right.  Did you ever have a conversation with

15  Torsten Zabka about these comments that Juan José Villegas

16  shared with you about Torsten's alleged comments about you?

17    A.   No.

18    Q.   Okay.  Why not?

19    A.   Because Valve told me I was negative, dramatic, I

20  complained too much.  And so I tried to keep my complaints

21  at minimum.

22    Q.   Okay.  Now, you said Juan Lo.  Do you know what

23  Juan Lo's full name is?

24    A.   Juan Lorenzo Atienza [phonetically].

25    Q.   Okay.  And so when did this Juan Lo make a



1 comment to you in which he said that Torsten Zabka had made
2 some sort of insulting comment to you based on your gender
3 identity?
4     A.    Both Juan Lo and José said that they didn't want
5 to tell me this because they didn't want to hurt my
6 feelings, but there was a point in time after my transition
7 where Torsten was assigning tasks to the unpaid
8 translators.  And during this conversation, there was a
9 reference to me.
10         And so the translator corrected Torsten to use
11 the proper pronoun.  And Torsten snapped and said, "He,
12 she, it.  I don't care."
13     Q.    All right.  Do you know why Torsten, as you say,
14 snapped and made that comment?
15     A.    Because Torsten was angry in that moment.
16     Q.    And do you know why Torsten was angry?
17     A.    Because Torsten did not like me, obviously.
18     Q.    All right.  Did you ever ask or did you ever talk
19 with Torsten about this -- this occasion in which you say
20 he snapped and made this comment?
21     A.    I did not talk with Torsten about this specific
22 occasion because if -- too many reasons.  One is
23 because I wanted to keep my complaints at minimum to
24 preserve my job.
25         And the other reason is because, if memory serves

1 me correctly, I found out about this comment either
2 slightly before or slightly after my termination.  But,
3 again, I'm not a hundred percent sure because there were so
4 many things happening in that period of time.
5     Q.    Okay.  Did you ever go to Dina Nelson and report
6 to Dina Nelson that any of the people we talked about late
7 this morning made these inappropriate, insulting, demeaning
8 comments based on your gender identity?
9     A.    Yes.
10     Q.    Okay.  How many times did you talk -- well,
11 did -- did you report Nate Heller's alleged comments to
12 Dina Nelson?
13         MS. RHOADS-WEAVER:  Object to form.
14     A.    I reported the incident involving Nate to my
15 supervisor, Doug Valente, not to Dina.
16     Q.    (BY MR. SHAPERO)  Okay.  But I'm just asking
17 questions about Dina.
18     A.    Okay.
19     Q.    So did you ever report anything concerning Nate
20 Heller to Dina Nelson?
21     A.    I might.  I don't remember.
22     Q.    Okay.  Did you ever report anything concerning
23 Brock Loomis to Dina Nelson?
24     A.    Yes.  Yes.
25     Q.    Okay.  What did you say to Dina Nelson about

1 Brock Loomis and when?
2     A.    In 2009 when I had a conversation with Kathy and
3 Dina Nelson, I said that Brock Loomis was using derogatory
4 names and was snickering.  That's the term I used,
5 "snickering."  I remember that term.
6     Q.    Okay.  How did Dina respond to that?
7     A.    She pretended -- she acted like she was sorry for
8 that.
9     Q.    All right.  And, again -- did it ever happen
10 again with Brock Loomis?
11     A.    With Brock Loomis, it happened a few times.  More
12 than with other people.  I don't -- what I know is that
13 with Brock Loomis, it happened more than once.  What I do
14 not know is if it's before or after my conversation with
15 Dina Nelson, it happened again.
16     Q.    You're not sure?
17     A.    I'm not sure about that.
18     Q.    Did you ever talk to Dina Nelson about Justin
19 Lesamiz?
20     A.    Yes.
21     Q.    All right.  And what did you say to Dina and when
22 about Justin?
23     A.    I actually remember that Dina came into the
24 conversation a bit later.  I talked to Kathy Gehrig first.
25 And then Dina reached us after a little bit, and Kathy was

1 relating to Dina what I was saying about Justin and Brock
2 and Keith Huggins.  So what -- they didn't say anything
3 specific.
4     Q.    Okay.  After you talked with Dina Nelson about
5 Justin, did Justin ever engage in any, what you believe to
6 be, inappropriate comment that you heard?
7     A.    Justin kept being extremely rude to me.
8     Q.    Okay.  But was he being rude, or was he making
9 inappropriate comments based on your gender identity?
10     A.    He was not making comments to my face, no.
11     Q.    Okay.  Did you talk to Dina Nelson about Eric
12 Wells?
13     A.    No.
14     Q.    Did you talk to Dina Nelson about Keith Huggins?
15     A.    Yes.
16     Q.    And, again, when and what happened in this
17 conversation with Dina Nelson regarding Keith Huggins?
18     A.    Nothing really happened.  They -- both Dina and
19 Kathy, they were there listening to me, showing their
20 concern or pretending to show their concern.  But nothing
21 really happened.
22     Q.    What do you mean "nothing really happened"?  Did
23 they say anything to you?  Did they apologize?  Did they
24 express sympathy?  What did they say?
25     A.    When I say "nothing really happened," I mean they



1 didn't say we're going to take appropriate measurements.
2 They just said that they were sorry. And I remember Kathy
3 said that she was very sorry and she even teared up, Kathy
4 Gehrig.
5     Q. So after you talked to Dina Nelson about Keith
6 Huggins, did you ever hear Keith Huggins make an
7 inappropriate comment about you and your gender identity
8 again?
9     A. No.
10     Q. All right. Did you ever talk to Dina Nelson
11 about Torsten Zabka about any comments he may have made
12 about your gender identity?
13     A. Yes.
14     Q. And did he ever make such comments to you -- did
15 you ever hear any comment from Torsten after you had that
16 conversation with Dina?
17         MS. RHOADS-WEAVER: Object to form.
18     A. I was fired after I complained about Torsten
19 creating a hostile environment.
20     Q. (BY MR. SHAPERO) Yeah. But that's not the
21 question I asked, was it?
22         I asked whether you ever heard Torsten make a
23 comment that was inappropriate, insulting, demeaning, based
24 on your gender identity, whether you heard him make such a
25 comment after you expressed concerns to Dina Nelson?

1         Did you ever here Torsten make such a
2 commencement?
3     A. I couldn't.
4     Q. Okay. Did you ever talk to Dina Nelson about
5 Patrick McClard?
6     A. No.
7     Q. Did you ever talk to Dina Nelson about Romy
8 Hatfield?
9     A. Yes.
10     Q. And what happened in that conversation about Romy
11 Hatfield that you had with Dina Nelson?
12     A. Same thing like I said before. They were sorry,
13 they said. They didn't know what to say. They were not
14 prepared because they hadn't -- they didn't say anything
15 specific.
16     Q. All right. Again, after you talked with Dina
17 Nelson about Patrick McClard, was there ever an occasion in
18 which you heard Patrick McClard make any sort of insulting
19 demeaning, offensive, inappropriate comment to you based on
20 your gender identity?
21     A. No.
22     Q. And then the same thing with Romy Hatfield? Did
23 you talk to Dina Nelson about Romy?
24     A. Yes.
25     Q. And did Romy Hatfield ever make an inappropriate,

1 insulting, offensive comment to you about your gender
2 identity after you talked to Dina Nelson and expressed your
3 concerns?
4     A. Not to my face, no.
5     Q. Okay. All right. Now, every time I asked you
6 whether you talked to Dina Nelson, you said I also -- or at
7 least on some of the occasions I asked about your
8 conversations with Dina Nelson, you said you had similar
9 discussions with Kathy Gehrig; is that correct?
10     A. Yes.
11     Q. Did they share HR responsibility at the time?
12     A. Initially, yes.
13     Q. Okay. And then you made a comment that you had
14 reported something that you believed inappropriate. You
15 had reported to Doug Valente.
16     A. Yes.
17     Q. Did you talk to Doug -- and who is Doug Valente?
18     A. Doug Valente was my supervisor in 2008, 2009. I
19 don't remember when he was removed from the supervisor
20 position, but he was my supervisor for a few years.
21     Q. Okay. And when you said he was your supervisor,
22 did he tell you, Hey, I'm your supervisor? Did he use that
23 language?
24     A. Yes.
25     Q. He did? And what did he tell you about his

1 supervisory role over you? Did he have a job title for
2 himself? Just help me understand what he explained to you.
3     A. First of all, in our time sheets, there was the
4 heading, the headers, "Supervisor: Doug Valente." Or
5 "Supervisor: Patrick McClard."
6         In addition to that, during our discussion, even
7 on -- even on positive things, because not everything was
8 negative, of course, Doug Valente, of course, had
9 decisional power on who to hire, who to fire. He was a
10 fully fledged supervisor.
11     Q. Okay. Did you ever talk to Doug Valente about
12 concerns you had about inappropriate comments by Nate
13 Heller?
14     A. Yes.
15     Q. Okay. And what happened in that conversation
16 with Doug Valente?
17     A. He said -- he rolled his eyes, and he said that
18 it broke his heart.
19     Q. Go ahead.
20     A. I'm sorry.
21     Q. No. I'm sorry. Go ahead.
22     A. He said, literally -- Doug seemed genuinely
23 sorry. He said, "It breaks my heart."
24     Q. All right. And then, again, I think you've
25 already testified, you never heard anything like that from

1 Nate Heller again, correct?

2    A.  Correct.

3    Q.  And did you talk with Doug Valente about Brock

4 Loomis?

5    A.  Yes.

6    Q.  And, again, what happened in that conversation

7 with Doug Valente about Brock Loomis?

8    A.  He was extremely disappointed.

9    Q.  Okay.

10    A.  And he said that he was going to take care of it.

11    Q.  All right.  And, again, I think your testimony is

12 you never did hear anything from Brock Loomis after that,

13 that was disparaging with you based on your gender

14 identity, correct?

15    A.  No.  Sorry.  As I said before, Brock Loomis was

16 one of the people who might have heard with my own ears

17 making derogatory comments more than once.  I talked about

18 Brock with Doug Valente.  I talked about Brock with Dina

19 and Kathy.

20    What I cannot answer, because I cannot remember

21 if -- like if two comments were made before I talked to

22 Doug and two comments were made after, or maybe three were

23 made before and two -- is it clear what I'm trying to say?

24    Q.  It is clear.  I think your testimony before was

25 that you can't recall whether he stopped those comments

1 after you had those conversations or not.  Maybe one or two

2 after, but you're just not sure?

3    A.  I do remember that he was kept -- after a few

4 months I complained, that he was still working in support.

5 That, I remember for sure.  And I also remember that he was

6 fired, not because of what he was saying to me, but because

7 of the joke.

8    Q.  Right.

9    A.  So those are the things that I remember.

10    Q.  Okay.  Did you talk with Doug Valente about

11 Justin Lesamiz?

12    A.  Yes.

13    Q.  And, again, did you ever hear Justin make an

14 inappropriate comment to you based on your gender identity

15 after you had that conversation with Doug Valente?

16    A.  No.

17    Q.  Did you talk with Doug Valente about Eric Wells?

18    A.  No.

19    Q.  Did you talk with Doug Valente about Keith

20 Huggins?

21    A.  Yes.

22    Q.  And, again, after you had that conversation with

23 Mr. Valente, did Keith Huggins -- did you ever hear Keith

24 Huggins make an inappropriate comment to you based on your

25 gender identity?

1    A.  No.

2    Q.  Did you talk with Doug Valente about Romy

3 Hatfield?

4    A.  Yes.

5    Q.  Did you ever hear an inappropriate comment by

6 Romy Hatfield after you had that conversation?

7    A.  No.

8    Q.  Did you talk with Doug Valente about Patrick

9 McClard?

10    A.  No.

11    Q.  Did you talk with Doug Valente about Torsten

12 Zabka?

13    A.  I talked about -- yes, but -- I talked about

14 Torsten Zabka.

15    Q.  Okay.  What did you say to Doug Valente about

16 Torsten?

17    A.  I complained about Torsten with Doug.  But not

18 because of the gender identity; for other issues.

19    Q.  What were the other issues?

20    A.  The other issues was that he was being very

21 abusive and difficult to work with, and he wanted -- he

22 wanted us -- there was a sort of conflict of interest

23 between Doug, who was the support supervisor on the one

24 hand, and Torsten, who was the translation supervisor on

25 the other hand.

1    So Torsten was always creating conflict and being

2 absolutely abusive, and so I complained with Doug about

3 Torsten.

4    Q.  What conflicts did Torsten create?

5    A.  Like, he would -- seems that he enjoyed

6 confrontation.  He would try to find a reason to fight or

7 to argue.

8    Q.  Was this with you or with everybody?

9    A.  At first, I thought it was with me.  It was

10 especially with me.  But I found out later that other

11 people had problems with Torsten.

12    Q.  All right.  Did you talk to Torsten?  Did you

13 ever ask him why he -- why he had, what you believe, were

14 so many conflicts?

15    A.  Yes.

16    Q.  What did he say to you in response?

17    A.  Sometimes he would say, "Okay.  Well, let's just

18 move on.  Let's try to work out our differences."

19    This was sometimes -- sometimes it would just

20 snap.  I remember one time I was having a meeting with him

21 in a conference room to try to minimize any conflict that

22 we might have, and he just snapped and walk away.

23    Q.  Okay.  Now, your tenure as a payroll employee at

24 Valve ended in early 2012, correct?

25    A.  It ended in February 2012.

1    Q.  All right. After February 2012, were you ever --
2 again, did you ever enter Valve's offices?
3    A.  I did not enter Valve's offices, no.
4    Q.  And why is that?
5    A.  Because I was going through a transition.
6    Q.  All right. Did anybody at Valve invite you to
7 come back and visit the office and participate in meetings,
8 anything of this sort after you relocated to Los Angeles?
9    A.  Yes.
10   Q.  And you declined those requests?
11   A.  Yes.
12   Q.  And, again, why did you decline those requests?
13   A.  It was impractical. I have extreme anxiety so
14 traveling for me is very hard. Even traveling today was
15 hard. And, plus, because they said -- because they made it
16 obvious that they were not comfortable with me during the
17 peer review, I wanted to keep a professional relationship.
18       I wanted to keep it mostly as a professional
19 relationship without -- without entering into a hybrid
20 realm. Because people at Valve, they -- they do trips
21 together. They do activities together.
22       And so I wanted to distance myself from that,
23 because a lot of people at Valve showed me more than once
24 that they didn't like me.
25   Q.  Who at Valve showed you they didn't like you? Is

1 it anyone other than the names we've talked so far?
2    A.  During my peer reviews, I didn't have the
3 specific name, but it seems like the general complaints
4 were things that are attributable to my disabilities,
5 whereas people who complained thought that they were just
6 my personality traits and I was being -- I was being how
7 can I say, a jerk? I don't know if it's appropriate to say
8 that term. So they made it very clear that they didn't
9 like me.
10   Q.  How many times did you receive comments from
11 Valve in connection with some kind of peer review process?
12   A.  I think at least twice.
13   Q.  And do you remember any specific comments that
14 were made about you that you felt were critical of you?
15   A.  Yes.
16   Q.  What were the comments that you remember?
17   A.  You want to know only the negatives? Or the
18 positives as well?
19   Q.  Right now I'd like to know only the negatives.
20   A.  Dramatic, withdrawn, negative, disruptive, you
21 need to walk on the eggshells.
22   Q.  In other words, they were saying they felt they
23 needed to walk on eggshells around you?
24   A.  Yes.
25   Q.  Okay. Anything else?

1    A.  For the peer review or comments that my
2 supervisors might have given to me?
3    Q.  Comments that came to you that you felt were
4 negative, critical in the peer-review process?
5    A.  Well, Doug Valente explained -- for the peer
6 review, he said that I get flustered. I get flustered,
7 that's what he said. And he said that he knew I was very
8 hardworking. I was very -- I had my stuff together. I was
9 organized, but that I was just different. And I was not --
10 I was not merging myself into the team.
11   Q.  So did you feel that you were disruptive at all
12 at Valve?
13   A.  I do not feel I was disruptive at all.
14   Q.  And did you try to get -- did you ask questions,
15 try to understand what they were talking about when you got
16 feedback that you were disruptive?
17   A.  Yes. I tried to understand.
18   Q.  And what was explained to you about this
19 disruptive issue?
20   A.  It never made any sense to me.
21   Q.  Do you remember what they said, whether or not it
22 made sense to you?
23   A.  I remember Doug Valente gave me an example. He
24 said -- because there was one guy who was VAC -- VAC
25 banned -- VAC is a ban that they put on gamers who cheat.

1 So this guy was VAC-banned. He was from Spain, and he
2 contacted support.
3       And I replied in Spanish, because at that time I
4 was doing Spanish, Italian and Portuguese for the ticket.
5 And Doug told me, "You got flustered because of that. It's
6 not a big deal."
7       And then I told Doug -- I said, "Listen, Doug,
8 it's because I take my job seriously."
9       He said, "Yeah, I can see that. But you're just
10 different."
11       I said, "Yeah, well, I'm different."
12   Q.  All right. So after you relocated to Los Angeles
13 and you never entered Valve's offices again, how did you
14 communicate with others at Valve? Was it by phone, by
15 email, phone, chat? How did it work?
16   A.  In writing. I communicated in writing.
17   Q.  All right. So did you ever receive any
18 communications in writing, at any time, from Valve that you
19 believed were insulting, demeaning, critical and
20 inappropriate based on your gender identity?
21   A.  Yes.
22   Q.  And when were those?
23   A.  After I changed my name legally in 2012, I sent
24 an email to the whole department. And I said, "Okay. This
25 is my official name." I sent a nice email. "Please update



1  my name."

2         And people -- a lot of people would still refuse

3  to use my new name, and they still kept me as an old name

4  on Link as Antonello. So of course, I felt very

5  disappointed. Because I said, "I am a person. I'm not a

6  character. I worked hard to reclaim my identity. Why are

7  you -- I said, "Why are you refusing to do something as

8  simple as changing a name on Link?"

9         How do I know -- go ahead.

10     Q.  Did anybody ever tell you that they were refusing

11  to change your name or to recognize you as a woman?

12     A.  Yes.

13     Q.  Who told you that?

14     A.  John Baker. He still kept me as Antonello. And

15  I --

16     Q.  I'm sorry. That's a different question. I'm not

17  asking about what names they actually used.

18         I'm asking did anybody at Valve ever send you a

19  message in writing that said "Antonella or Antonello, I am

20  not going to recognize you as a woman or use your female

21  name"? Did anybody actually send you a message that said

22  that or said something like that?

23     A.  No.

24     Q.  Okay. And I think you testified that the only

25  way you communicated with Valve people after February 2012

1  was in writing; is that right?

2     A.  I would say 95 percent was in writing, but there

3  have been a couple of phone calls with Dina. Or a couple

4  of times, I had meeting on Skype with the other

5  translators, with the other localizers.

6     Q.  Okay. During any of the Skype meetings, did

7  anyone ever make an insulting, demeaning comment or

8  actively refuse to recognize you as a woman?

9     A.  No.

10     Q.  All right. What about in the phone conversations

11  you had with Dina? Was there ever a time when she refused

12  to recognize you as a woman or when she made some sort of

13  demeaning or insulting comment to you about you based on

14  your gender identity?

15     A.  No.

16     Q.  Isn't it at least possible that some of the

17  people that continued to communicate with you using the

18  name Antonello, isn't it possible that this was just out of

19  habit or carelessness? Is that just possible?

20     A.  No.

21     Q.  And why do you say that's not possible?

22     A.  Because changing a name on the system, it takes

23  less than one minute. If you cannot spend one minute to

24  acknowledge a person and respect her, even if you don't

25  have to like her, I think it's done in maliciousness. I

1  think it's done like -- what I see -- what I interpreted it

2  to say is we are not taking you seriously.

3     Q.  Did anybody ever tell you they're not taking you

4  seriously? Did anybody at Valve ever say to you "we don't

5  take you seriously"?

6     A.  No. They never said that.

7     Q.  Okay. What do your parents call you?

8     A.  Antonella.

9     Q.  Did they pretty -- like when you told them that,

10  it changed? They never fell back? They never accidentally

11  called you Antonello?

12     A.  My parents have known me for several years. If

13  they make slips, they're justified. They try harder.

14     Q.  I see. But do you have any brothers or sisters?

15     A.  I have one brother.

16     Q.  All right. What's your brother's name?

17     A.  Vito.

18     Q.  And older? Younger?

19     A.  Older.

20     Q.  All right. Has your brother ever slipped?

21     A.  No, actually, he hasn't.

22     Q.  Okay. Do you have any other personal friends

23  outside of Valve that have slipped and referred to us as

24  he or Antonello at any point after you announced your name

25  change?

1     A.  Can you please say slipped in oral or slipped in

2  writing?

3     Q.  Either way.

4     A.  I'm trying to -- I have one friend who has never

5  slipped in writing, but he slipped a couple of times in

6  oral communication.

7     Q.  How long have you known that friend?

8     A.  Ten years.

9     Q.  Okay. Did you keep any record of the times on

10  which anybody at Valve slipped or intentionally called you

11  by something other than your name or your -- who didn't use

12  a feminine pronoun?

13     A.  I had -- I remember that I had taken a couple of

14  screenshots in 2012 of people who still kept me as

15  Antonello or were calling me Antonello.

16     Q.  And what happened to those screenshots?

17     A.  They disappeared completely because in 2012, my

18  desktop died completely. And Valve replaced it with a new

19  desktop. And so I had saved them, but they weren't -- they

20  disappeared completely.

21     Q.  All right. Was this a Valve computer or your

22  personal computer?

23     A.  Valve computer.

24     Q.  And this was a personal computer that was in your

25  home?



1 identity?

2    A.   If people look at me, that's not harassment.

3 People can look at me for many reasons.

4    Q.   Right.

5    A.   If people invade my personal space and call me

6 names, there's a big difference.

7    Q.   Yeah. How many times in 2017 have people --

8 again, having nothing -- just want to talk about nothing to

9 do with Valve right now.

10        How many times in 2017 do you feel like you've

11 been demeaned or insulted by other people, away from Valve,

12 in connection with your gender identity?

13   A.   At least, I would say, five times at least.

14 Maybe more.

15   Q.   Okay. Have you been assaulted, physically

16 assaulted or threatened by anybody in 2017?

17   A.   No. No.

18   Q.   Not in connection with your gender identity or

19 anything else?

20   A.   No.

21   Q.   All right. Now let's go into 2016. Again, we're

22 not talking about Valve. We're only talking about people

23 who are not in any way affiliated with Valve.

24        How many times in 2016 were you the victim, do

25 you believe, of some kind of insult because of your gender

1 identity?

2    A.   In 2016, more than once. There are a few times,

3 actually.

4    Q.   All right. And how many times in 2016 were you

5 the victim of some kind of threat or physical threat or

6 attack?

7    A.   Physically, once in 2016.

8    Q.   All right. So when you describe -- when you say

9 you're having traumatic stress syndrome, is it because of

10 these events you're talking about, these things I just

11 talked about in 2016 and 2017?

12   A.   This and the job loss.

13   Q.   Okay.

14   A.   Both things.

15   Q.   All right. And what if it would turn out that

16 the job loss was entirely lawful? Would that make it any

17 less traumatic for you?

18   A.   It is not lawful.

19   Q.   Yeah, but let's just say a court made a

20 determination -- I'm asking you a hypothetical. If a court

21 made a termination that your termination of your

22 independent contractor or employment relationship, however

23 the court finds that relationship, if the court found that

24 that was perfectly lawful, would that be any less stressful

25 for you?

1    A.   I have difficulty answering this type of

2 hypothetical question.

3    Q.   I'm sorry? You what now?

4    A.   I have difficulties answering this question

5 because it's highly hypothetical.

6    Q.   Yeah. Do your best to answer it, even though

7 you're having some difficulties.

8    A.   If a court determined, hypothetically speaking,

9 in the unlikely event that the court would see everything

10 and determine that the termination was unlawful --

11   Q.   Was lawful?

12   A.   -- was lawful, I would still feel very upset and

13 depressed.

14   Q.   All right. When you sued Andrea Rush, did you

15 use your name Antonella Maddalena?

16   A.   Yes.

17   Q.   That was in 2014, correct?

18   A.   Yes.

19   Q.   You had already changed your name to Antonella

20 Maddalena, right?

21   A.   Yes.

22   Q.   When you sued Arturo Davila in 2012, did you use

23 your name Antonella Maddalena in the lawsuit?

24   A.   I don't remember. That one, I don't remember.

25   Q.   And when you sued Blue Shield, again, was your --

1 did you use Antonella Maddalena?

2    A.   No.

3    Q.   And when you sued Anthem Blue Cross, did you use

4 Antonella Maddalena?

5    A.   No.

6    Q.   Now, you said you think you're more vulnerable to

7 attack if your name is public.

8        Why don't you explain that for me.

9    A.   Yes. I'm very happy to explain.

10       If I sue about a car or if I sue about a deposit,

11 I don't mind if my name is fully disclosed. But whenever I

12 sue in a case where there are sensitive medical records and

13 there is a sensitive situation involving my transition or

14 other very private topics, then of course, the name -- the

15 name privacy is a necessity.

16       When you went through the records, you noticed

17 that in certain lawsuits, my name wasn't spelled out; in

18 other lawsuits, my name was only conveyed with initials.

19 The difference is that for a medical case or for a case

20 like this, the contingency, the circumstances are

21 completely different. So that is why the anonymity is

22 necessary.

23   Q.   Let's go back to when you were hired at Valve in

24 November 2008.

25       Do you recall, what was the job you were hired to

1  fill in November 2008?

2     A.  Multilingual technical support.

3     Q.  And is that the job title you maintained

4  throughout the time that you were on the Valve payroll from

5  November 2008 to February 2012?

6     A.  I don't remember that.

7     Q.  Okay.  Now, what about your job duties when you

8  started in 2008?  Do you -- can you describe for me what

9  exactly were your job duties when you started at Valve in

10  November 2008?

11     A.  I had two main types of job duties.  One was

12  answering tickets, support tickets --

13     Q.  Okay.

14     A.  -- in different languages.  So I was answering

15  support tickets in Italian, Spanish and Portuguese.

16        The other are function was a localizer or

17  translator.

18     Q.  So in 2008, what portion of your job -- what

19  percentage of your job was devoted to, you say, these

20  customer support tickets?

21     A.  I would say probably at least 70 percent.

22     Q.  All right.  And then was -- then there were -- 30

23  percent remaining were translation, or were there other

24  things in addition?

25     A.  At that specific time, 30 percent probably was

1  translations.

2     Q.  All right.  So that any other job duties back in

3  2008, other than tickets and translation, were so small

4  that they just didn't matter that much?

5     A.  I think so.

6     Q.  All right.  So let's just start now with -- well,

7  we'll start with translation, the 30 percent.

8        What was it that you translated in 2008 as a

9  translator?

10     A.  I would translate, first of all, templates of

11  responses that we would give to customers.  So whenever a

12  customer contacted us, we would have the response ready.

13  We would only slightly modify it.

14        The other translation task I had was translating

15  video game descriptions for our storefront.

16     Q.  All right.  Any other translating duties back in

17  2008?

18     A.  The Steam store, the Steam front store.  Whenever

19  there were sales or things, I had to translate the

20  messages.  Like, for instance, buy this game 50 percent off

21  for today.

22     Q.  And so you would translate that into Spanish,

23  Portuguese and Italian?

24     A.  I translated it into Spanish and Italian, because

25  my Portuguese is not as good as to do those kind of

1  translations.  But my Portuguese was good enough to use

2  prewritten templates to respond to Portuguese customers

3  about common uses.

4     Q.  I see.  Okay.  So you had translation duties only

5  for Spanish and Italian.  You can customer support,

6  customer ticket duties that included Portuguese?

7     A.  Correct.

8     Q.  All right.  And moving back to translation, 30

9  percent of your job, when did you did those translations,

10  did you have to be signed into a Valve computer network or

11  account of some kind?

12     A.  Not in 2008.

13     Q.  All right.

14     A.  Not in 2009.

15     Q.  Okay.  How did you do that translation work in

16  2008, 2009?  Were these emails being exchanged, or were

17  people handing you pieces of paper in the office?  How did

18  that work?

19     A.  No.  There was never handing pieces of paper in

20  the office.  There were -- never happened.  At the

21  beginning, we would do everything on the computer.  And

22  before the Steam Translation Server was created, I would

23  use, like, Notepad.

24        And so Torsten would assign me tasks and say,

25  "Translate this or translate that."  So I would translate

1  it into note pads.

2     Q.  All right.  And you would do that -- let's back

3  up.

4        When you were at Valve in 2008, 2009, were you in

5  the office?  Did you do all your work initially in the

6  Valve offices in Bellevue?

7     A.  Sometimes I worked from home, like after-hours.

8  I did mostly -- most of my job from the office, but I also

9  worked from home.

10     Q.  All right.  And how did you get translation work

11  done at home if you weren't in the office?  Again, did you

12  sign into a computer account?  How would you do that?

13     A.  I signed in to VPN.

14     Q.  VPN?

15     A.  A remote desktop.

16     Q.  All right.  So you needed a special password as a

17  Valve employee to sign into VPN?

18     A.  Correct.

19     Q.  Okay.  All right.  So again, in 2008, 2009, all

20  your translation work was either on a Valve computer in the

21  Valve office or using a Valve password to get into a Valve

22  VPN account remotely from your home; is that right?

23     A.  Yes, it's right unless I am forgetting something.

24  But I don't think so.

25     Q.  All right.  Let's go to the 70 percent of your



Page 186

1 Togenicha, and my password. And then I could start
2 translating.
3     Q. All right. And so the Togenicha name, does that
4 have some significance?
5     A. Yes.
6     Q. What is that?
7     A. Togenicha is a name, anime, a manga character, a
8 Japanese manga.
9     Q. Got it.
10     A. That I really like.
11     Q. Okay. So again, going back to my question.
12 2008, 2009 when you traveled, if you traveled to L.A., that
13 was before STS. So the only way to go in and do
14 translation work was through the VPN system.
15     But then after STS was created, then you could
16 just go to the website and log in that way to STS, correct?
17     A. That's correct. And I'm sorry if I confused you.
18     Q. You didn't confuse me. I just wanted to clarify.
19     A. Thank you.
20     Q. Okay. And, again, anytime you would sign in to
21 the STS, there's a record, Valve would have a record of
22 when you signed in and did your work, correct?
23     A. Correct.
24     Q. All right. 2011, again, did your work change
25 materially in 2011? Again, it was just -- it was roughly

Page 187

1 50/50, but it changed seasonally, right?
2     A. Correct.
3     Q. Did you have any additional duties, other than
4 the ticket work or the STS work, in 2011?
5     A. I would make phone calls occasionally.
6     Q. What kind of phone calls and to whom and for what
7 purpose?
8     A. What happened is that a lot of times, mothers or
9 fathers would find out that their kids had purchased games
10 on our -- on their platform.
11     Q. I've made those discoveries myself at home. Yes,
12 I understand.
13     A. And so I had to speak in Spanish because most of
14 these people were -- even though they lived in the U.S.,
15 they didn't speak English. And so they specifically
16 requested somebody to speak Spanish.
17     So I would make those phone calls, and I would
18 talk to the parent who was frustrated. And I was trying to
19 help them and resolve the issue, keeping both parties
20 happy. Keeping the parent happy but also following Valve's
21 guidelines strictly.
22     Q. Okay. Any other job duties -- well, let me back
23 up.
24     So what you've described is part of the process
25 of responding to customer concerns, but what you are saying

Page 188

1 is that this would move beyond the ticket and you would
2 actually have conversations?
3     A. That is correct, yes.
4     Q. All right. Any other job duties other than what
5 we've just discussed?
6     A. I mean, there were playtestings, now that I think
7 about it.
8     Q. I'm sorry. Playtesting?
9     A. Playtestings, yes.
10     Q. Okay. How -- what's that?
11     A. Oh, like when a new game was being released, like
12 when Left 4 Dead 2 was being released -- it's the name of a
13 game, Left 4 Dead 2 -- when this game was being released
14 and everybody was working on it, we had to playtest a lot.
15 I had to playtest.
16     I played that games for hours and hours and
17 hours, especially to check if there were language issues,
18 if certain words did not appear on screen, and so they had
19 to be shortened.
20     So I had to use my linguistic skills, but I also
21 had to playtest as much as possible to immerse myself into
22 the game and try to do the best to make sure the product
23 was excellent, the final product.
24     Q. And by 2011, what portion of your job involved
25 playtesting?

Page 189

1     A. I cannot tell you exactly because this was just
2 maybe lasted two weeks.
3     Q. All right. So very small?
4     A. Very small.
5     Q. You might have a week or two when you were doing
6 a lot of those, but overall on the year 2011, it hardly
7 happened at all?
8     A. Yes.
9     Q. All right. Do you consider yourself to be a
10 gamer?
11     A. I am not an avid gamer, but I am a gamer for
12 sure.
13     Q. Okay. Let's move to 2012.
14     And you relocated to Los Angeles in approximately
15 February 2012, correct?
16     A. Correct.
17     Q. And did your job duties change at all after you
18 relocated to L.A.?
19     A. No. My job duties were exactly the same once I
20 relocated to Los Angeles.
21     Q. So in 2012, what percentage of your work was STS
22 work and what percentage of it was ticket work?
23     A. Roughly, the same as the previous years.
24     Q. Okay. And did you have any newer or fewer job
25 duties in 2012?



1    A.   Not in 2012. They stayed the same.

2    Q.   All right. And, again, still in 2012, did you

3  work mostly then from your Toluca Lake and then your Studio

4  City home?

5    A.   Not mostly. I would say like 99 percent of the

6  time.

7    Q.   Ninety-nine percent. Do you recall traveling

8  outside of the Los Angeles area during 2012?

9    A.   Yes.

10   Q.   And did you carry a Valve laptop with you?

11   A.   I carried a Valve laptop, and I carried a Valve

12  monitor with me so that even when I was traveling and I was

13  recovering from my surgeries, I wanted to make sure that I

14  had both screens.

15   Q.   Okay. And when you did work, whether it was from

16  your home in Toluca Lake or Studio City, or when you

17  traveled, again, the same way -- you did the work the same

18  way: You would have to sign in to DeskPRO to do the ticket

19  work, you would have to sign in to STS to do the

20  translation work, correct?

21   A.   Correct

22   Q.   Now, were you the -- I think you mentioned

23  something about volunteer translators.

24        So did you do all the translation work of content

25  messages, what have you, into Spanish, Italian, or were

1  other people doing that translating?

2            MS. RHOADS-WEAVER:   Object to form.

3    A.   Before answering that question, there is a

4  terminological issue. I have never used volunteer

5  translators.

6    Q.   (BY MR. SHAPERO)  Okay.

7    A.   I don't think I've used that translation unless

8  I'm having Alzheimer's now, because I've always used the

9  expression "unpaid translators," because that's what they

10  were.

11   Q.   Okay. Yeah. All right. Was there unpaid

12  translators, or was there anyone else at Valve translating

13  content into Spanish or Italian?

14   A.   Yes, the unpaid translators.

15   Q.   And when did the unpaid translators' work start?

16  Do you recall?

17   A.   2009.

18   Q.   2009. So did you have any sort of job

19  responsibilities with respect to the unpaid translators or

20  the translations they did?

21   A.   Yes. I had to coordinate their translators, but

22  I also had to evaluate their translations.

23   Q.   All right. So let's take that one at a time?

24        You said you had to coordinate translators. What

25  did that involve?

1    A.   This is before or after the creation of the STS?

2    Q.   Well, let's talk before -- we'll talk 2008 and

3  2009, up until whenever the STS was created. You testified

4  you don't recall that exact date.

5        So pre-STS, how did that work?

6    A.   Pre-STS, Torsten told me that there were these

7  translators that were working for us for free and to reach

8  out to other community guys and to recruit more translators

9  and basically to -- to tell them to translate some game

10  descriptions that would appear in English in our Steam

11  storefront. So I would coordinate that.

12        I would stay focused on this. Can you please

13  translate this? Can you please translate that?

14   Q.   Anything else? Was there anything else involved

15  in coordinating the work of unpaid translators prior to

16  STS?

17   A.   Again, we are talking about prior to the

18  existence of STS?

19   Q.   We are.

20   A.   For my languages, I was coordinating, but then

21  Torsten was above me. So he was coordinating my

22  coordination.

23   Q.   How did he do that?

24   A.   He would check. He would say, "Translate this.

25  This game is very popular on Steam, and we have the

1  description in English. This needs to be prioritized." Or

2  he would say, "Have these things translated so I can upload

3  them and I can publish them."

4    Q.   Okay. Now, what happened after STS was created?

5  How did that -- how did your coordination jobs duties

6  change?

7    A.   After STS was created, I was the admin for the

8  Italian and Spanish language. And what I would do was

9  approve or reject translations done by the unpaid

10  translators.

11        And those translations done by the moderators had

12  been in turn translated by someone else. So in other

13  words, it was like a pyramid structure. There were all

14  these unpaid translators at the bottom who would translate

15  things. On top of those, there were moderators who would

16  filter, correct, make changes to those translators.

17        And then I was the one who would make the final

18  decision about whether a translation has to be rejected or

19  not. And then, of course, there was Torsten, who was above

20  me being a supervisor.

21   Q.   But, again, he didn't speak Spanish, so he

22  couldn't really evaluate any of the translations, correct?

23   A.   But he always -- even though he didn't speak

24  Spanish, he always had a say on things.

25   Q.   All right. When you translated into Spanish, was



1    A.  Yes.

2    Q.  What did you ask and of whom?

3    A.  I talked to Doug first about the use of a light,
4  a light for seasonal depression.

5    Q.  Like a sunlight?

6    A.  Yes.

7    Q.  Did you get a sunlight?

8    A.  Yes.

9    Q.  Valve provided that for you?

10    A.  Yes.

11    Q.  Okay.  Did you ask Doug or anyone else at Valve
12  for anything else in connection with your depression?

13    A.  I don't remember.

14    Q.  Okay.  You can't remember anything else you did
15  ask for in connection with your depression, right?  As far
16  as you can remember, the only thing you asked for is work
17  from home, work from L.A. and a sunlight.

18        And you got all three, right?

19    A.  Yes.

20    Q.  Okay.  Was there any other medical condition,
21  other than Asperger's, anxiety and depression, that you
22  went to Valve and said, "You've got to help me, or I would
23  like some help because of this medical condition"?

24        Is there any other medical condition you haven't
25  listed other than these three?

1    A.  My transsexualism.

2    Q.  And you asked, in connection with your
3  transsexualism, you asked for time off to get various
4  surgical procedures, right?

5    A.  Yes.

6    Q.  And you got that time off, right?

7    A.  Yes.

8    Q.  And you asked for the ability to move to L.A.,
9  and you were allowed to work from L.A., correct?

10    A.  Yes.

11    Q.  All right.  Is there anything else you asked for
12  in connection with your transsexualism?

13    A.  I asked to get feedback about how I was doing my
14  job because it was important for me to keep it.

15    Q.  And when did you ask for this feedback?

16    A.  Many times.  One time was in 2012.

17    Q.  All right.  Did you get that feedback?

18    A.  Yes.

19    Q.  All right.  Anything else?

20    A.  It was very positive.

21    Q.  Good.  Did you ask for anything else of Valve in
22  connection with your transsexualism?

23    A.  To have job stability.

24    Q.  Okay.

25    A.  And I didn't get that.

1    Q.  Well, you got that all the way until January
2  2016, correct?

3    A.  Until I've completed my transition.

4    Q.  Okay.  But is -- have I given you an accurate
5  date?

6        You had job stability until January 2016,
7  correct?

8    A.  Yes.

9    Q.  And when did you ask for job stability?  When was
10  the first time you asked for that?

11    A.  There were several conversations, even formal or
12  informal, with Dina, with Doug, with --

13    Q.  I just asked when.

14    A.  I'm telling you.  There are several
15  conversations, so I cannot tell you a single day.

16    Q.  Okay.  You can't remember any of the dates?  All
17  right.

18        (Exhibit No. 1 marked
19        for identification.)

20    Q.  (BY MR. SHAPERO)  Okay.  Ms. Maddalena, the court
21  reporter has just handed you what's been marked as Exhibit
22  1.

23        And do you recognize this document?

24    A.  Yes.

25    Q.  And is this a document that is labeled at the top

1  "Independent Contractor Agreement"?

2    A.  Yes.

3    Q.  And is this a document that was signed by you and
4  Valve?

5    A.  Yes.

6    Q.  If you turn to page 5, there's a place for
7  company signature and a place for contractor signature; is
8  that correct?

9    A.  Yes.

10    Q.  And is that your signature under -- or above
11  Antonello Maddalena?

12    A.  Yes.

13    Q.  Okay.  At the time you signed this contract, were
14  you still going by the name Antonello Maddalena?

15    A.  Officially -- I was not.  I was not.

16    Q.  Okay.

17    A.  But I had not changed it legally yet.

18    Q.  All right.  Did you ask Valve, when they gave you
19  this contract, to change the name to Antonella?

20    A.  No.

21    Q.  Okay.  Why didn't you make that request?

22    A.  Because I was waiting for the change to become
23  official and fully legal to be able to make that request.

24    Q.  All right.  So did you consider this to be
25  disrespectful in any way, that Valve was asking you to sign

Page 322

1  again, a collaboration.

2     Q.  Okay.

3     A.  Because they had ideas.  And because they are not

4  super comfortable with their English, I would give them

5  suggestions to correct.

6     Q.  So you collaborated with others in drafting

7  messages that you -- they were planning to send to the

8  press about your lawsuit against Valve, correct?

9     A.  Yes.

10    Q.  And who was this that you collaborated with?

11    A.  I collaborated with Juan José, and I collaborated

12  with Victor.

13    Q.  Victor.  And who is Victor?

14    A.  Yes.  Yes.

15    Q.  I see.  And did you send messages to -- or

16  participate in a Reddit chat room --

17    A.  Yes.  Yes.

18    Q.  -- about your lawsuit against Valve?

19    A.  Yes.

20    Q.  Okay.  And you named Valve when you participated

21  in those Reddit chats, correct?

22    A.  The threads were about Valve.  I didn't initiate

23  those.

24    Q.  Did you participate in them at all?

25    A.  Yes.

Page 323

1     Q.  Okay.  And did you participate for the purpose of

2  defending Valve, or did you participate for some other

3  purpose?

4     A.  I participated for stating the truth.

5     Q.  All right.  Okay.

6        MR. SHAPERO:  I want to honor the promise I

7  made to you to end at 5:45.  I may still have questions,

8  but we're going to call a recess today.  And we can decide

9  together later whether and when and how we'll continue this

10  deposition.

11        THE VIDEOGRAPHER:  This is the end of Disk

12  No. 5 and adjourns this deposition.  The time is now 5:43

13  P.M.  Going off the record.

14        (Deposition concluded at 5:43 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Page 324

1              C E R T I F I C A T E

2  STATE OF WASHINGTON )
                       ) SS.
3  COUNTY OF PIERCE    )

4

5        I, the undersigned Washington Certified Court
   Reporter, pursuant to RCW 5.28.010 authorized to administer
6  oaths and affirmations in and for the State of Washington,
   do hereby certify;

7

       That the annexed and foregoing deposition
8  consisting of pages 1 through 323 of the testimony of each
   witness named herein was taken stenographically before me
9  and reduced to typed format under my direction;

10       I further certify that according to CR 30(e) the
   witness was given the opportunity to examine, read and sign
11  the deposition after the same was transcribed, unless
   indicated in the record that the review was waived;

12

       I further certify that all objections made at the
13  time of said examination to my qualifications or the manner
   of taking the deposition or to the conduct of any party
14  have been noted by me upon each said deposition;

15       I further certify that I am not a relative or
   employee of any such attorney or counsel, and that I am not
16  financially interested in the said action or the outcome
   thereof;

17       I further certify that each witness before
18  examination was by me duly sworn to testify the truth, the
   whole truth and nothing but the truth;

19

       I further certify that the deposition, as
20  transcribed, is a full, true and correct transcript of the
   testimony, including questions and answers, and all
21  objections, motions, and exceptions of counsel made and
   taken at the time of the foregoing examination and was
22  prepared pursuant to Washington Administrative Code
   308-14-135, the transcript preparation formal guidelines;

23

       I further certify that I am sealing the
24  deposition in an envelope with the title of the above
   cause and the name of the witness visible, and I am
25  delivering the same to the appropriate authority;

Page 325

1        I further advise you that as a matter of firm
   policy, the Stenographic notes of this transcript will be
2  destroyed three years from the date appearing on this
   Certificate unless notice is received otherwise from any
3  party or counsel hereto on or before said date;

       IN WITNESS WHEREOF, I have hereunto set my hand
4  and affixed my official seal this 17th day of May, 2017.

5

6

7

8

9

10

11

       VALERIE L. SEATON, RPR, CCR
12     Certified Court Reporter in
       the State of Washington
13     License No. 2557

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

     STATE OF WASHINGTON  )
 3                        )  SS.
     COUNTY OF PIERCE     )

 4

 5          I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
 6   oaths and affirmations in and for the State of Washington,
     do hereby certify:

 7

            That the annexed and foregoing deposition
 8   consisting of pages 1 through 323 of the testimony of each
     witness named herein was taken stenographically before me
 9   and reduced to typed format under my direction;

10          I further certify that according to CR 30(e) the
     witness was given the opportunity to examine, read and sign
11   the deposition after the same was transcribed, unless
     indicated in the record that the review was waived;

12

            I further certify that all objections made at the
13   time of said examination to my qualifications or the manner
     of taking the deposition or to the conduct of any party
14   have been noted by me upon each said deposition;

15          I further certify that I am not a relative or
     employee of any such attorney or counsel, and that I am not
16   financially interested in the said action or the outcome
     thereof;

17

            I further certify that each witness before
18   examination was by me duly sworn to testify the truth, the
     whole truth and nothing but the truth;

19

            I further certify that the deposition, as
20   transcribed, is a full, true and correct transcript of the
     testimony, including questions and answers, and all
21   objections, motions, and exceptions of counsel made and
     taken at the time of the foregoing examination and was
22   prepared pursuant to Washington Administrative Code
     308-14-135, the transcript preparation format guidelines;

23

            I further certify that I am sealing the
24   deposition in an envelope with the title of the above
     cause and the name of the witness visible, and I am
25   delivering the same to the appropriate authority;
```



1        I further advise you that as a matter of firm
policy, the Stenographic notes of this transcript will be
2   destroyed three years from the date appearing on this
Certificate unless notice is received otherwise from any
3   party or counsel hereto on or before said date;
         IN WITNESS WHEREOF, I have hereunto set my hand
4   and affixed my official seal this 17th day of May, 2017.

5

6

7

8

9

10

11                         _____

12                         VALERIE L. SEATON, RPR, CCR
                          Certified Court Reporter in
                          the State of Washington
13                         License No. 2557

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    D E C L A R A T I O N

 2

 3

 4

 5

 6              I declare under penalty of perjury that

 7   I have read my within deposition, and the same is true

 8   and accurate, save and except for the changes and/or

 9   corrections, if any, as indicated by me on the

10   Correction Sheet.

11

12              Dated this _____ day of _____, 2017, at

13   _____ (city/state).

14

15

16                         _____

17                         ANTONELLA MADDALENA

18

19

20

21

22

23

24   VALERIE L. SEATON, RPR, CCR

25   License No. 2557
```

```
 1   MOBURG, SEATON & WATKINS
     COURT REPORTING & LEGAL VIDEO
 2   2033 SIXTH AVENUE, STE. 826
     SEATTLE, WA 98121
 3   206-622-3110   FAX 206-343-2272

 4   _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 5   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS SHEET
     AND SIGN THE ACCOMPANYING DECLARATION.
 6   _____

 7   PAGE     LINE          CORRECTION AND REASON

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                                   _____
                                         ANTONELLA MADDALENA
23                                      Date taken:   5-6-17

24
        REPORTER:   VALERIE L. SEATON, RPR, CCR
25
```

```
 1    MOBURG, SEATON & WATKINS
      COURT REPORTERS
 2    2033 SIXTH AVENUE
      SUITE 826
 3    SEATTLE, WASHINGTON 98121
      (206) 622-3110
 4

 5    TO:   BARBARA J. RHOADS-WEAVER       May 17, 2017
            FOCAL PLLC
 6          900 First Avenue South
            Suite 201
 7          Seattle, Washington 98134
            Barb@focallaw.com
 8
      IN RE:  A.M. VS. VALVE CORPORATION
 9
      DEPOSITION OF:  ANTONELLA MADDALENA, taken 5-6-17
10

11        A copy of the deposition transcript of the above-named
      deponent review the transcript and sign the Correction
12    Sheet and Declaration.  The signed Correction Sheet and
      Declaration should then, within 30 days, be forwarded to:
13    deponent is provided via E-transcript.  Please have the
                         VALERIE L. SEATON
14                       MOBURG, SEATON & WATKINS
                         2033 Sixth Avenue, Ste. 826
15                       Seattle, Washington 98121
      who will then enclose them in the original transcript, seal
16    trial.it, and forward it to MR. SHAPERO for retention until
      the time of
17
          If you have any questions, feel free to contact me at
18    the number listed above.

19
      Sincerely,
20

21

22    VALERIE L. SEATON, RPR, CCR

23
      cc:  L. Shapero
24

25
```

